## Case vs. Fish and others.

*April 18 — May 31, 1883.*

INTEREST: USURY. *(1, 2) Relation of debtor and creditor essential to usury: case stated. (3) When agreement for more than seven per cent. must be in writing: equity. (4) Settlement of accounts not invalidated merely by inclusion of compound interest. (5) Compound interest not usurious. (6) Application of partial payments.* CHATTEL MORTGAGE: *(7) Of after-acquired goods, invalid.*

1. To constitute usury within the prohibitions of the statute there must be an intention knowingly to contract for and take more *for the mere use of money* than the law allows. There must be *a loan* the principal of which is *to be repaid* with illegal interest by way of compensation for its use.

2. Upon the evidence in this case it is *held* that the plaintiff, who at one time was the mortgagee of the personal property used by the defendants in their business, had become the absolute owner thereof by the purchase of the equity of redemption at a judicial sale; that, by agreement between the parties, he was to furnish means and credit, and the defendants were to carry on the business as his agents until he should receive from the profits thereof the amounts paid and advanced by him, together with annual interest thereon at the rate of ten per cent., and compensation for his services and expenses, and were then to be entitled to the ownership of the property and assets of the concern; that the business was carried on under such agreement for a number of years, the plaintiff advancing large sums thereto and being personally responsible for all its debts; and that the relation of debtor and creditor did not exist between the parties in the management of the business. The statutes relating to usury had, therefore, no application to the transactions under the agreement, and the parties might lawfully agree that, in addition to interest at ten per cent. upon all advances, the plaintiff should receive out of the business a certain sum annually or a percentage upon his advances, as compensation for his services and for the responsibility incurred.

3. Sec. 1, ch. 61, Tay. Stats. (sec. 1688, R. S.), refers only to a loan or forbearance of money, and the agreement above mentioned for the payment of interest at the rate of ten per cent. on advances made by the plaintiff, though not in writing, is valid. If the defendants ask, in a court of equity, to have the property and business

as their own, they must, as a condition, pay the rate of interest so agreed upon.

4. A settlement once deliberately made is not to be opened except upon the clearest and most positive proof of fraud or mistake therein; and it will not be disturbed merely because compound interest in favor of one party has been allowed therein.

5. An agreement to compound interest does not render a contract usurious; and, upon adjusting their accounts, parties may agree that interest due shall be turned into principal and draw interest.

6. When partial payments have been made, the payment is to apply in the first place to the discharge of the interest due. If the payment exceeds the interest, the surplus goes towards discharging the principal, and the subsequent interest is to be computed on the balance of principal remaining due. If the payment be less than the interest, the surplus of interest must not be taken to augment the principal, but interest continues on the former principal until the period when the payments, taken together, exceed the interest due, and then the surplus is to be applied towards discharging the principal, and the interest is to be computed on the balance.

7. A chattel mortgage of after-acquired goods does not create a lien, legal or equitable, by force of the mortgage, on after-acquired goods.

APPEALS from the Circuit Court for *Racine* County.

The complaint alleges that prior to and during the year 1867 *Titus G. Fish* and Abner C. Fish were partners in the business of manufacturing wagons at Racine under the firm name of Fish Brothers; that in December of that year said firm became embarrassed and were indebted to numerous persons, including the plaintiff, in about the sum of $100,000, which they were unable to meet; that thereupon an agreement was entered into between said firm and the plaintiff "whereby the plaintiff should buy up the outstanding indebtedness of the Fish Brothers and they should transfer to him all their assets; that plaintiff should take their business, allow them to run and manage the same for him and as his agents, and that they should manufacture the stock on hand and market the same until they should be able to and should

pay the advances so made with interest at ten per cent. per annum, together with the indebtedness owing to the plaintiff and all expenses, after which the remaining assets and properties, if any, should be returned and belong to said firm of Fish Brothers;" that, in pursuance of such agreement, the assets of the firm (being then of the value of about $50,000) were assigned to the plaintiff or purchased by him at judicial sale, and the possession of the real estate was given to him, and that the business was continued and carried on under the name and style of "Fish Brothers, Agents;" that the business became more extensive, requiring additional capital, and that the plaintiff accordingly advanced from time to time and invested therein large sums of money, and also extended to the business and permitted therein at all times the use of his unlimited credit and pecuniary responsibility, and that the same has ever since been used and exercised therein.

It is further alleged that, with the consent of the plaintiff, in 1872, Fish Brothers conveyed an interest in said business to *Edwin B. Fish*, and in 1873 the interest of Abner C. Fish was sold and conveyed to *Titus G. Fish*, *Edwin B. Fish*, and *John C. Huggins*, the defendants in this action; that the business has ever since been carried on by said defendants under the agreement above mentioned and under the name and style of "Fish Bros. & Co., Agents;" and that the said *Edwin B. Fish* and *John C. Huggins* were fully advised of the relations of the plaintiff to the business and of its liabilities to him, and expressly assumed the same to the extent of the interests acquired by them.

The complaint further alleges that, in addition to the large advances of capital made by the plaintiff, his personal credit has been used therein by the defendants to an amount unknown to the plaintiff, but which he believes to be an average of upwards of half a million dollars per annum for eight years last past; that it has always been understood and agreed

that for such use of his name and credit he should have out of the business a reasonable compensation, and that such compensation has been to a limited extent charged and allowed in account, but no such charge has been made since the year 1875; that the advances made by the plaintiff to the business were in part charged in open account and in part evidenced by promissory notes, and that on the 1st day of January, 1876, a full settlement and adjustment of the account between the parties was had, and it was found that the amount which the plaintiff was then entitled to receive out of the business upon open account, in addition to the promissory notes mentioned below, was $108,436.64; that for advances (and interest thereon) made as aforesaid and in the course of the business, the following promissory notes have been executed by Fish Brothers and Fish Bros. & Co. to the plaintiff and are now held by him, to wit: Five notes for $5,000 each, dated December 19, 1867, due in three, six, nine, twelve, and twenty-four months from date respectively, with interest at ten per cent. per annum, interest on the twenty-four months' note being payable annually, each of said notes having the interest indorsed thereon as paid to January 1, 1876; one note for $15,262.75, dated January 1, 1876, due one year after date, with interest at ten per cent. payable annually; two notes dated February 1, 1876, one for $5,000, due four months after date, with interest at ten per cent. per annum, and the other for $4,627.77, due ninety days after date, with interest at ten per cent. per annum, the latter having indorsed thereon, "Received in notes $2,562.36, June 1, 1876;" two notes dated January 29, 1877, one for $7,000, due ninety days from date, and the other for $8,000, due four months from date, each with interest at ten per cent., and that no part of said notes or of the interest thereon, except as shown by said indorsements, has been paid.

The complaint further alleges that statements of account of advances by the plaintiff and receipts by him have been

rendered from time to time and agreed to, and, as the plaintiff until very recently believed and was given to understand, without objection or difference on the part of the defendants, and that ever since the settlement of January, 1876, the plaintiff, relying upon and believing in the integrity of the defendants toward him and in their good faith and disposition to carry out the original agreement, has continued to extend his credit, name, and influence to the business, whereby it became large and lucrative, and for several years past has been in a condition to reduce his claim, and for a time the defendants did reduce such claim and interest in the business by applications of money from the business, but since April 1, 1880, the same has not been reduced; that the plaintiff is unable to state the precise amount due him without an account being taken, but upon information and belief alleges that it is not less than $60,000, exclusive of the amount due on the notes, and that, including that amount, it exceeds $150,000; that the plaintiff is entitled to a reasonable compensation for the use of his name and credit in the business since the accounting of January 1, 1876, and that the same is reasonably worth $25,000.

The complaint further alleges that the defendants, as Fish Bros. & Co., Agents, and the said business, are indebted to various persons in large amounts, aggregating about $200,000 actual and $150,000 contingent liability, for all of which the plaintiff is responsible, and are continually incurring new liabilities, for which the plaintiff is likewise responsible; that the plaintiff is unwilling that his credit and capital should be longer used in the business, for the reasons, among others, that the defendants, though heretofore well able to have repaid the plaintiff in full out of said business, have not done so, but have continued to carry on business on his credit and capital, to greatly enlarge the factory, and otherwise invest large sums of money which ought to be applied to the reduction of his claim and the payment

of the indebtedness of the business, and at the same time give out that legally the business owes the plaintiff nothing, and repudiate his interest therein, thereby putting in jeopardy his rights and interests; that until he is reimbursed his demands and released from his responsibility for the business, the plaintiff is entitled to the possession and control of the business and its assets; that the business cannot be successfully continued without the capital and credit of the plaintiff, but must eventually be wound up, and that its continuance by the defendants, with the plaintiff's credit withdrawn, will seriously jeopardize the claims of its creditors and of the plaintiff.

The plaintiff therefore prays for an accounting; that the amount due to the plaintiff upon open account, and upon said notes, and for his credit and services, may be ascertained and paid to him out of the assets of the business; that a receiver be appointed; and that the defendants be restrained from further using the name or credit of the plaintiff for the purposes of the business.

The answer, after denying generally all matters not admitted, alleges the partnership of *Titus G. Fish* and Abner C. Fish, in 1867, under the name of Fish Brothers; that in January, 1868, said firm failed with liabilities amounting to about $100,000 and assets amounting to about $60,000; that the plaintiff, who is an uncle by marriage of said partners and of the defendant *Edwin B. Fish*, was a creditor of said firm in the sum of $25,000, of which $10,000 was secured by a mortgage on the real estate of the firm executed December 18, 1867; that at the time of the execution of said mortgage the firm was indebted to the plaintiff in the sum of $20,000, of which $15,000 had been advanced by him prior to that time, and $5,000 was advanced at that time, and that subsequent to that time the plaintiff advanced the further sum of $5,000, making in all the sum of $25,000, for which said Fish Brothers gave their five notes for $5,000 each, mentioned in the complaint, bearing date December 19, 1867;

that about January 10, 1868, Fish Brothers effected a compromise with their creditors, who (except a few) agreed to take forty per cent. of their claims in full satisfaction thereof, payable in instalments at future periods, and it was agreed between Fish Brothers and the plaintiff that he should indorse their paper to perfect such compromise, and in consideration thereof they agreed to pay his claim in full with accrued interest; that it was soon ascertained that the refusal of certain creditors to assent to the compromise rendered its execution impracticable, and it was then agreed that the plaintiff should purchase and take assignments to himself, for the benefit of Fish Brothers, of such claims as could be bought for forty per cent., and he did so to a considerable amount, and the firm resumed and continued its business until about January 23, 1868, when it was threatened with suits by creditors who had not assented to the compromise, so that its ability to carry on the business was put in doubt and difficulty unless some further arrangement should be made; that thereupon the plaintiff, having purchased claims amounting to about $30,000, recovered two judgments thereon against Fish Brothers, which judgments, it was agreed between the plaintiff and Fish Brothers, should be enforced only as security for the repayment of the forty per cent. of the claims embraced therein advanced by the plaintiff, and were suffered to be taken by the plaintiff with that intent and purpose; that executions upon such judgments were immediately issued and levied upon all the personal property of Fish Brothers, and the same was sold to the plaintiff, who purchased and acquired title thereto with the understanding and agreement that he should hold the same as security for the advances already made by him, and such as he should thereafter make to enable Fish Brothers to carry on the business, and that they then assigned to him, for a like purpose and upon the same terms, all of their outstanding notes and accounts.

The answer further alleges that, about the time the plaint-

iff so acquired title to the personal property and assets of Fish Brothers, it was agreed that he would presently loan them such sums as should be necessary to enable them to take up the claims of all their other creditors or would purchase them for their benefit, and that they should carry on the business as theretofore, but under the name of "Fish Brothers, Agents," and that the plaintiff would loan them such sums as should be necessary to carry on their business successfully; but it was distinctly agreed that all moneys so · furnished were loaned to them, and all property purchased and used in the business and the business itself should be theirs, and the plaintiff's title thereto be held by him solely as security for the said loans and advances; that it was then agreed that the $25,000 represented by the five notes aforesaid, and such sums as should be advanced to purchase the claims of creditors, should be regarded as permanent loans not presently payable, but that such sums as he should advance from time to time to enable them to carry on the business should be regarded as temporary or short loans to be presently repaid out of the profits of the business; that the said Fish Brothers, Agents, continued to occupy, in connection with their business, all their real estate, shops, and improvements; that the alleged agency was ostensible and not real, and that the business was their own proper enterprise and business, subject to the plaintiff's claim thereon for security for moneys loaned and to be loaned; that the plaintiff professed great friendship for them, manifested great interest in their welfare and success, and counseled with them about their business and its conduct; and that they reposed the utmost trust and confidence in him and freely and implicitly trusted him with all their property, assets, and interests as security as aforesaid, and in good faith resumed business under the style of "Fish Brothers, Agents," and continued to carry on the business and extend it so as to make it more profitable until Abner C. Fish re-

tired therefrom, dating from January 1, 1873; that the en-
tire sum advanced by the plaintiff in taking up the claims
of their creditors was $28,420.20, which was in fact advanced
in the winter of 1868, and for which he received assignments
of said claims for their benefit; that about April 25, 1871,
the firm of Fish Brothers, Agents, purchased for their busi-
ness a certain described parcel of land from one Heath, and
caused the same to be conveyed to the plaintiff as further
security; that an account current was kept by the plaintiff
of temporary loans and advances and also of the amount
advanced to purchase the claims of creditors (the forty per
cent. account), of which last amount $3,420.20 was charged
to Fish Brothers, Agents, as of January 1, 1871, and the
balance thereof, being $25,000, was charged to them on Jan-
uary 1, 1874, as of January 1, 1871. A copy of the account
current is annexed to the answer.

The answer further alleges that all the property of *Titus
G. Fish* and Abner C. Fish, except wearing apparel, house-
hold furniture, and a cheap homestead of the former were,
in the month of January, 1869, invested in the business and
subject to the plaintiff's control as security for his loans;
that such property consisted of real estate, with shops, ma-
chinery, tools, stock, accounts and other choses in action,
together with the good-will of the business, which was then
of great value; that they were then utterly unable to redeem
the same from the plaintiff's claims for said loans and ad-
vances, which then amounted in all to not less than $65,000;
that the plaintiff, well knowing these facts, and that in refer-
ence to such property they were wholly within his power
and dependent upon his will, and contriving to overreach,
injure, and oppress them, and intending to take advantage
of their situation and necessities, about January 27, 1869,
demanded that said firm of Fish Brothers, Agents, should
agree to pay a sum as interest upon the original debt and
upon all loans and advances made and to be made by him

equal to twelve and one half per cent. per annum thereon; that though reluctant and unwilling to comply they were compelled by their situation to agree thereto, and it was then further agreed that he should receive interest for the year then expired at the same rate, and that the excess over ten per cent. should be annually charged in the account current under the name and guise of personal and clerk's services or amount for use of name, and the usurious interest was so charged on January 27, 1869, for the year 1868, at $2,000, on March 2, 1870, for the year 1869, at $1,500, and on May 30, 1871, for the year 1870, at $1,250; that on May 30, 1871, the plaintiff also charged on said account current interest on the account from December, 1867, compounded annually at ten per cent., and credited said Fish Brothers, Agents, with interest at like rate and in like manner on the credits of said account, leaving a balance of interest in his favor on said items, and also interest on the five notes for $25,000 and on the amount advanced to purchase the claims of creditors (forty per cent. account), to January 1, 1871, compounded annually at the rate of ten per cent.; that at the same time the plaintiff charged in the account current as aforesaid the sum of $3,420.20, part of the forty per cent. account, and that the so-called permanent loans were thereby reduced to $25,000 on the five notes and $25,000 on the forty per cent. account; that on January 10, 1872, the plaintiff charged on the account current interest at ten per cent. for the year 1871 on the so-called permanent loan; that no further account was rendered in relation to said matters until January, 1874, when the plaintiff, in pursuance of the usurious agreement aforesaid, charged in said account, under date of January, 1872, "for use of name," the sum of $1,250, and at the same time charged interest on the $25,000 balance of the forty per cent. account at the rate of ten per cent. for the year 1871, and at the rate of twelve and one half per cent. per annum for the years 1872 and 1873, the interest

for the years 1872 and 1873 being compounded at the rate of twelve and one half per cent., and at the same time charged interest at the rate of twelve and one half per cent. under said agreement on the said items, "for use of name," and on all items of advances made after January 1, 1872, down to January 1, 1874; that between January 10, 1873, and June 1, 1873, the plaintiff advanced to the firm of Fish Brothers, Agents, in and for their business, about $75,000, including about $5,000 advanced December 3, 1872, all of which was advanced under the agreement, before stated and hereinafter alleged, that the plaintiff should receive interest thereon at the rate of twelve and one half per·cent.; that about January 1, 1873, the firm, having enlarged their business·and nearly doubled the capacity of their factory, were greatly in need of money, and applied to the plaintiff for additional loans, and the plaintiff, know-·ing that they were entirely in his power, demanded that they should pay interest on all sums advanced at the rate of twelve and one half per cent. per annum, and they were compelled to agree thereto, and the loans made thereafter, including the amounts embraced in the notes mentioned in the complaint as dated January 1, 1876, February 1, 1876, and January 29, 1877, were made in pursuance of such usurious agreement; that all of the aforesaid charges for interest and for interest compounded and for usurious interest enter into and form part of the account alleged in the complaint to have been settled and adjusted on January 1, 1876, and form part of the plaintiff's claim and demand in this action; and the defendants deny that there has ever been any accounting, settlement, or adjustment of the accounts.

The answer further alleges that in 1871, the defendant *Edwin B. Fish* acquired an interest of one eighth in the business, subject to the payment of the proper proportion of the obligations of the firm; that in September, 1874, Abner C. Fish sold and transferred to said *Edwin B. Fish* and to the

defendant *John C. Huggins,* each a one-fourth interest in the business, the plaintiff assenting thereto, and they agreeing on their part to assume all the obligations and demands which the plaintiff then had against the firm arising out of said business, so far as the said Abner C. Fish was obligated and liable therefor; that the said Abner C. Fish was then discharged from all obligation to the plaintiff; and that since that time the business has been carried on by the defendants in this action, *Titus G. Fish, Edwin B. Fish,* and *John C. Huggins,* under the firm name of " Fish Bros. & Co., Agents."

The answer admits that the business, in 1873 and some subsequent years, required the advances of large sums, which were loaned by plaintiff; that the business was aided by the reputed connection of the plaintiff therewith; that it was known that they were aided in the business by his capital and credit, and they were enabled to maintain a creditable commercial standing and do considerable business; that their purchases were made in the name of Fish Brothers, Fish Brothers, Agents, and Fish Bros. & Co., Agents, but not upon the personal credit of the plaintiff in any other way than that it was known that he was interested in and had furnished means and capital for the business; that the plaintiff had agreed with one bank to become responsible for such paper of Fish Brothers, Agents, as should be held by such bank, and in some instances had indorsed paper of the firm, but it was never understood or agreed that the plaintiff should have any compensation for the use of his name or credit, and the charges made ostensibly for such use were in fact made as a cover and device in the execution of the usurious agreement before mentioned; that the advances made by the plaintiff were charged in the account current and were partly evidenced by promissory notes; that statements were rendered from time to time, but no settlement or adjustment was ever made. And it is alleged that since the making of the usurious agreement before men-

tioned, by reason of the plaintiff's power over them and their embarrassed circumstances they have been unable and have deemed it unsafe and unwise to attempt any formal settlement or adjustment of the accounts, fearing that unless they should submit to his unconscionable demands the plaintiff would break up their business; that from January, 1868, until the commencement of this action the plaintiff has used his power derived from the dealings herein set forth to coerce the firm of Fish Brothers, and Fish Brothers, Agents, and Fish Bros. & Co., Agents, into submission to all his demands, and has threatened to put a receiver into possession of the property, although he has expressed a willingness to continue their creditor if they would pay the interest claimed; that they have been kept in great fear of loss by reason of the relation which he sustained to the business and his great wealth and influence, and in consequence thereof have offered him more than $50,000 in excess of any sum legally and equitably due him, in order to avoid the ruinous effects of legal proceedings.

The answer further alleges that no statement of account was rendered by the plaintiff after January 1, 1874, until January 1, 1876, on which day he rendered an account in which he charged interest on an alleged balance of $120,756.75 under date January 1, 1874, at the rate of ten per cent. to January 1, 1875, amounting to $12,075.67, and compounded the same with said alleged balance and charged interest thereon at said rate of ten per cent. to January 1, 1876, amounting to $10,981.05, after crediting payments received during that period, and at the same time charged up two per cent. on the five notes for $25,000 for the years 1874 and 1875 and two per cent. on the account during that period, amounting together to the sum of $5,665.55, which last sum was charged in pursuance of the usurious agreement and in excess of ten per cent.; that he also charged on the said five notes for $25,000, interest at the rate of ten per cent. compounded each year from January 1, 1871, to January 1,

1876, amounting to $15,272.75, for which the defendants then executed their note of that date mentioned in the complaint; that said last-mentioned sum includes one year's interest on said five notes which had been entered in the general account. It is admitted that the defendants executed the other notes mentioned in the complaint, and is alleged that such notes were executed for advances in pursuance of the usurious agreement before mentioned and with the understanding that the plaintiff should have twelve and one half per cent. interest thereon.

The answer further alleges that since January 1, 1868, payments have been made to the plaintiff equal to all his advances, including the $25,000 evidenced by the five notes, and denies that anything is due to the plaintiff on the demands mentioned in the complaint, or that he is entitled to any compensation for the use of his name and credit, or that the same is worth the sum mentioned in the complaint. It alleges further that the defendants owe $78,600 and have a contingent liability of about $125,000; that they are managing the business so as to pay their liabilities, and are contracting no debts on the plaintiff's credit, and are not carrying on the business on his capital or credit and have no desire so to do; that it is true that they have given out that neither they nor the business owe the plaintiff anything; that their assets are ample for the payment of their just debts; that the plaintiff is not entitled to the control of the business and that his interests have in no wise been put in jeopardy except by the commencement of this action.

All of the foregoing allegations of the answer are restated as a counterclaim, which concludes with a prayer that an account may be taken, and if any sum shall be found due for principal loaned since March 16, 1871, the defendants may be allowed to tender and pay the same; that the judgments recovered by the plaintiff against Fish Brothers and the mortgage executed by them be adjudged to be dis-

charged; that the land purchased from Heath be decreed to be conveyed by the plaintiff to the defendants; that the notes mentioned in the complaint be canceled; and that the property and assets of the business be declared to belong to the defendants free from any claim or demand thereon on the part of the plaintiff.

In reply to the counterclaim the plaintiff denies that he acquired title to the personal property sold under the executions, or that Fish Brothers assigned to him their notes, accounts, etc., under any agreement that he should hold the same as security for advances made and to be made or in trust for them; but, on the contrary, he alleges, the agreement was that he should buy up their indebtedness, that they should transfer to him their assets, that he should take the business and allow them to operate it for him and as his agents, that they should manufacture the stock on hand and market it as his agents, and he should receive the proceeds thereof, and that when he should receive out of the business the amount of their debt to him of $25,000 and interest, and the amount expended by him in purchasing claims, with interest and expenses, and the amount which he should expend in operating the business, with interest, and reasonable compensation for his time and the responsibility assumed and the credit of his name, he should return to them any remaining assets and property. He further alleges that pursuant to such agreement the assets of the firm and the possession of their real property were delivered to him and he purchased the personal property at the judicial sale; that thereafter they operated the business as his agents and not otherwise, and that they had and have no interest therein until he receives therefrom the amount to which he is entitled.

The plaintiff further denies that it was agreed that he should loan or advance to them such sums as should be necessary to carry on the business, or that the money fur-

nished by him was loaned to the firm, or that the property purchased for the business should be their property or be held by him as security for his advances. He denies that it was agreed that the $25,000 evidenced by the five notes or the amount expended in purchasing claims should be regarded as permanent loans, or that other sums paid by him in the business should be regarded as temporary loans. He denies that the agency of Fish Brothers, Agents, was ostensible and not real, or that the business was their proper enterprise or business. But he alleges that the agreement was as above stated, and that the business and the property thereof were his own, to be managed as he saw fit, subject only to the verbal understanding which he has been at all times and is now ready and willing honorably to carry out, to surrender the same to Fish Brothers whenever he has received therefrom the amounts to which he is entitled.

The plaintiff admits that he entertained and professed great friendship for the members of the firm and was greatly interested in their welfare and success and frequently counseled with them as to the management of the business, because they were the agents and managers and he believed they would ultimately succeed thereto; but he denies that they trusted him with their property as security, or resumed business as Fish Brothers, Agents, to carry it on as their own. He alleges that on the contrary they were wholly insolvent, and he purchased the claims against them and operated the business to save them from the consequences of their bankruptcy, and expended money therein in order that he might receive back the amount of his indebtedness and the moneys paid in purchasing claims, and in the hope that after he was fully reimbursed, with reasonable compensation for his time, responsibility, and credit, he might be able to give them an established business free of debt. He admits the purchase of the Heath property, and that it was conveyed to him, but alleges that it was purchased with his

money for the more convenient dispatch of the business and that the title was not taken by him as security. He denies that an account current of temporary loans or advances or of any amount alleged to be loaned was kept by the plaintiff, but alleges that books of account of the business were kept, and denies that the account attached to the answer is a true account or was made by the plaintiff.

The plaintiff further admits that in January, 1869, *Titus G. Fish* and Abner C. Fish were poor and insolvent, and had no property not exempt from execution, and had no prospect of acquiring any, except as the plaintiff might build up the business, and, after receiving what he was entitled to, give it to them, but denies that he ever contrived to oppress them or thought of taking advantage of their situation, or ever demanded that they should agree to pay him interest at the rate of twelve and one half per cent., and denies in every form the alleged usurious agreements or that any usurious charge was ever made under any cover or device whatever. He alleges that it was a part of the arrangement by which he took the business that he should retain interest on the indebtedness of the firm to him and on all sums expended, at ten per cent. per annum, to be computed and reckoned in an account with annual rests; that it was not contemplated at first that any enlargement of the business would be entered into, and it was supposed that within a comparatively short time the plaintiff could receive what he was entitled to under the arrangement, and his relations to the business would cease, but it afterwards became apparent that the business could not be speedily wound up without great loss to him, and that the only prudent course was to continue the business and invest large sums therein, greatly in excess of the amount originally contemplated; that in January, 1869, after the magnitude of the enterprise had been somewhat developed, it was agreed that he should receive for his personal services and his clerks' as-

sistance for the year 1868, the sum of $2,000; that in the early part of 1870 it was likewise agreed that for such services for the year 1869 he should receive $1,500; and in the early part of 1871 it was agreed that for the year 1870 he should receive $1,250, and that he should thereafter receive a like sum per annum for such services, which amount included compensation for the responsibility incurred and the credit given to the business, it being understood, as the fact was, that he was alone responsible for all purchases and for all indebtedness incurred in the operation of the business; that through some oversight no charge for such services and use of his name for the year 1872 was made in the accounts; that, in the early part of 1874, as much larger outlays on his part had been rendered necessary on account of the financial panic of 1873, and larger responsibilities assumed by him, it was agreed that said compensation for his time, services, and credit for his name should be reckoned and allowed at two and one half per cent. on the amount of his outlays in the business and the indebtedness to him for the year 1873; that afterwards, in the early part of 1876, it was likewise agreed that such compensation for the years 1874 and 1875 should be allowed at two per cent. on the balance of accounts and notes for said years respectively, less two per cent. on any items of credit in the account, and under that arrangement he was allowed $5,665.56; that since then no specific sum has been agreed upon as such compensation, but that, in consideration of the constantly increasing liabilities assumed by him, he ought equitably to have $5,000 per annum.

The reply then alleges that on January 1, 1871, the plaintiff and Fish Brothers had an accounting, and after charging interest at ten per cent., compounded annually, on all outlays by the plaintiff and on the $25,000 represented by the five notes, and after charging the amounts allowed for plaintiff's services and credit for the years 1868, 1869, and 1870, the

interest of the plaintiff in the business was found to be and was stated and agreed upon as follows: amount due the plaintiff on the five notes, $25,000; amount due for moneys expended in purchasing claims of creditors, $25,000; amount due plaintiff as balance of the general running account with the business, $646.85 — making a total of $50,646.85; that the business was continued until January 1, 1876, when the plaintiff and the defendants had another statement and settlement of the account touching the plaintiff's interest in the business, and, after charging interest at the rate of ten per cent., compounded annually, according to the agreement, and crediting interest at a like rate and in like manner upon all sums received by the plaintiff, a balance was struck, and the plaintiff's interest in the business on said day was determined to be the sum of $108,436.64 over and above the amount due on the five notes and over and above the compensation for services and credit for the years 1874 and 1875; that at the same time interest on the five promissory notes from January 1, 1871, to January 1, 1876, was computed at the rate of ten per cent., compounded annually, and found to amount to $15,262.75, for which amount the defendants gave a new note mentioned in the complaint; that thereafter the compensation to the plaintiff for his services, responsibility, and credit for the years 1874 and 1875 was adjusted and allowed, upon the basis before stated, at the sum of $5,665.56, and was carried into the account at that sum; that since that time there has been no settlement or statement of the account, but the plaintiff is willing to surrender the business to the defendants upon payment to him of his interest in the business, computing interest on the notes and running account at ten per cent., with annual rests, and allowing a reasonable compensation for his time, services, and credit, the total of which amount he alleges to be upwards of $150,000.

The reply admits that the transfers to *Edwin B. Fish* and

Case vs. Fish and others.

*John C. Huggins* were made substantially as alleged in the answer, but alleges that all interests of any person in the business are subordinate to the plaintiff's rights. It denies all allegations in the counterclaim conflicting with the plaintiff's statement of the relations of the parties to the business and all allegations of usury, and that the note for $15,262.75, given for interest on the five notes for $25,000, included any interest which had been entered in the general account, and alleges that the notes afterwards given and mentioned in the complaint were executed as memoranda of advances made by the plaintiff in the business. It meets generally all the allegations of the counterclaim, and closes with a prayer for judgment as demanded in the complaint and that the defendants take nothing by their counterclaim.

The cause was referred to John B. Winslow, Esq., and the trial was had before him. It appeared from the evidence that before the plaintiff recovered the two judgments against the firm of Fish Brothers in 1868, upon claims purchased by him from their creditors, an execution, issued upon a judgment in favor of Pratt & Co. of Buffalo, N. Y., had been levied upon the personal property of the firm. By arrangement the sales upon that execution and upon the executions issued upon the plaintiff's judgments took place upon March 4, 1868. Enough property was first sold under the execution in favor of Pratt & Co. to satisfy it in full. The remainder of the property was then sold on one of the plaintiff's executions without entirely satisfying it, and the other execution was returned wholly unsatisfied. All of the property was bid in by the plaintiff.

The testimony is very voluminous, the printed case, together with the corrections thereto, embracing nearly six hundred pages. The view taken by the court of the evidence will sufficiently appear from the opinion.

The report of the referee was filed July 29, 1882, and was substantially as follows:

Findings of fact:

1. That prior to December 18, 1867, *Titus G. Fish* and Abner C. Fish were partners under the name of Fish Brothers, and had established an extensive trade of considerable value, and owned real and personal property employed in the business not exceeding $70,000 in value, and were indebted to the amount of about $100,000; that the plaintiff was then a creditor of the firm to the amount of $20,000, evidenced by several notes, and on that day it was agreed that he should then loan the firm $5,000 and afterwards advance other money not to exceed $5,000, or indorse for them to that amount, such loans and indorsements to be secured by a mortgage on all their real estate for $10,000; that accordingly the plaintiff loaned them $5,000, and took their note for that sum together with a bond and mortgage conditioned for the payment of such note and of any other advances made under the agreement, with interest at ten per cent. per annum; that on December 21, 1867, the plaintiff advanced $2,000 more under the conditions of the bond, but charged the same to the firm on open account and has never advanced any further sum or indorsed to any amount under said bond and mortgage.

2. That on December 19, 1867, the said firm gave the plaintiff the four promissory notes of $5,000 each, which are mentioned in the complaint, for their debt of $20,000 before mentioned, and also gave him a chattel mortgage to secure the same, covering all their personal property.

3. That on January 7, 1868, the said firm, being financially embarrassed, had a meeting of their creditors, and it was then agreed between the plaintiff and said firm that he should loan them a sufficient sum to enable them to compromise with their creditors, other than himself, at the rate of forty cents on the dollar, by purchasing for the benefit of the firm all the outstanding claims which he might be able to purchase at that rate, and said firm was to pay his claim

against them in full, and that he should loan and advance to them from time to time such sums as might be required to carry on the business, to be presently repaid out of the proceeds arising therefrom; that the plaintiff was to advance the money to effect such compromise or give his own notes to the creditors for such forty per cent. of their claims, and should take assignments of such claims to himself, and should charge to the firm on account the amounts so paid by him; that presently, in pursuance of such agreement, the plaintiff advanced for said firm in purchasing such claims the sum of $28,420.20, and charged the same to them in open account; and that they paid him $25 for his services in procuring such compromise.

4. That between December 19, 1867, and February 4, 1868, said firm turned over to the plaintiff a considerable part, if not all, of their accounts and bills receivable, and he collected the money thereon and credited them therewith, and advanced money to them from time to time, as occasion required, to pay for stock and for labor in the business and to carry on the same, and charged the same to the firm in open account.

5. That some of the creditors of the firm declined to compromise their claims, and suits were commenced and threatened, whereupon, by advice of counsel and with the consent of the firm, the plaintiff commenced two actions upon claims purchased by him at forty cents on the dollar under said agreement and assigned by the creditors to him, and said firm suffered the plaintiff to recover the judgments thereon mentioned in the answer for the full and original amount of said claims without any deduction or abatement whatever; that with the knowledge and consent of said firm the plaintiff caused executions on said judgments to be issued and levied upon nearly all of the personal property covered by said chattel mortgage to the plaintiff, and on March 4, 1868, by the acquiescence and consent of said firm,

substantially all of said property was sold at sheriff's sale to the plaintiff at the nominal price of about $7,000, subject to the said chattel mortgage; that said proceedings and sale were had and made for the greater security of the plaintiff, and that it was not understood by the parties that the same should in any manner change the relations or rights then existing between the plaintiff and said Fish Brothers; that the plaintiff paid nothing on said sales or either of them, but that the amount at which the property was bid off by plaintiff was returned upon one of said executions as paid upon said execution, and plaintiff continued to hold the notes secured by the said chattel mortgage, and charge said firm and claim from them only the amount which he had paid for the claims upon which said judgments were entered, and that it was understood that said judgments were not to be considered as of any validity as between said plaintiff and said firm, save as a means of transferring the legal title of said property to the plaintiff for his greater security, and to protect the same against the claims of other creditors of said firm who refused to compromise; that after the said formal sale on execution, for the greater security of the plaintiff, it was agreed between him and said firm, that said business should thereafter be carried on under the name and style of "Fish Brothers, Agents for *J. I. Case*," but this arrangement was not intended by the parties to change the relative rights and liabilities theretofore existing between the plaintiff and said firm; but it was understood and agreed that the property and business and the profits arising therefrom belonged to said firm, and that the plaintiff had and should have no interest therein except that he should hold the title thereof as security for all of the indebtedness of the firm to him, including that secured by the aforesaid real estate and chattel mortgages, and when the same should be paid, the title of the firm should be complete and free from all title, claim, or lien of the plaintiff therein or thereto, and it was

then further understood and agreed between them that the said firm should continue said business thereafter the same as before the said formal sale of said property on execution, and that the plaintiff should and would loan and advance to them such sums as might be required to carry on said business, and the said firm was to presently repay such sums out of the proceeds of the business in the current course of the same; and that current payments should be applied to the payment of current advances, or, as it was called, the open or running account; and the like understanding as to application of credits and payments subsequently existed between the plaintiff and the said firm of Fish Bros. & Co.; that in pursuance of such understanding and agreement, the business of the firm, after the execution sale, was carried into the same account, and conducted in all respects in the same manner as before, except as to the name and style of the firm.

6. That between December 18, 1867, and January 1, 1871, the said firm delivered to the plaintiff a large proportion of all drafts drawn on their customers, and of all bills receivable, accruing in the business, and he collected the money thereon and credited them therewith, and from time to time advanced to them money, as it was required in their business, and charged them therewith; and the said Fish Brothers and the defendants used the same in the purchase of real estate [a list of purchases being appended], which was bought for and has since been used in connection with the business; that the defendants also used a part of said advances in purchasing machinery, tools, stock, and materials, and in paying for labor, and from time to time made on said premises, from the proceeds of the business, valuable and permanent improvements, all with the knowledge and approbation of the plaintiff; that the amount advanced by the plaintiff on the current account, and the amount received by him from property or assets turned over to him,

fluctuated from a balance of debit against the firm to a balance of credit in their favor, and the aggregate amount of credit to the plaintiff during said period, with interest on each item at seven per cent. per annum, to January 1, 1871, is $273,570.09, and the aggregate amount of debit against him during the same period, with interest as aforesaid, is $281,969.85.

7. That after said business had been continued about one year, and about January 1, 1869, the plaintiff and said firm agreed that he should charge them on account the sum of $2,000 for personal and clerk's services in the year 1868; that about January 1, 1870, it was agreed that he should charge in like manner $1,500 for such services for 1869; that about January 1, 1871, it was agreed that he should charge in like manner $1,250 for such services for 1870, and a like sum for such services for 1871, each of which charges was made against the firm in the current account. "I do not find that these charges were made for interest in excess of the rate of ten per cent. per annum. The alleged usurious agreement of 1869, set forth in the answer, is not established by that clear preponderance of proof and degree of certainty required to establish such a defense;" and the defendants are chargeable with the several items above mentioned for personal and clerk's services.

8. That on April 25, 1871, said firm purchased of one Heath certain described real estate for $900, which sum was advanced by the plaintiff, and the title to said property was, by agreement, taken in his name as security; that the firm have expended $7,000 from the proceeds of the business in improving said property, and it has since been used by them in connection with the business.

9. That during all the time from December 19, 1867, to the commencement of this action, the said firm of Fish Brothers, and the defendants, the firm of Fish Bros. & Co., as their successors, have been indebted to the plaintiff, by

reason of the premises, in large sums of money, which they have, until within a short period before the commencement of this action, been utterly unable to pay; and that the plaintiff, by reason of the premises, and of the transfer to him of said property and the mortgages aforesaid, acquired a power, control and undue influence over the said firm of Fish Brothers, and the defendants, so that they have not been on equal terms with him in respect to said business transactions, but have yielded to his demands by reason of his power so acquired over them and their business, and through fear that if they did not do so he would presently enforce his demands, and extinguish and destroy their interest in their property and their business prospects; that the plaintiff, knowing the said property and business was under his control as aforesaid, and that said firms respectively were wholly in his power and dependent upon his will, charged against said defendants in said account current, compound interest computed annually at the rate of ten per cent. on the sums so loaned and advanced by him, as follows: Under date of May 30, 1871, on open account from December, 1867, the sum of $42,274.10; on said notes of $5,000 each, to January 1, 1871, the sum of $8,358.32; and on account of moneys paid to purchase the claims of creditors, from January, 1868, to January 1, 1871, the sum of $8,136.68; under date of January 1, 1874, on the account current from January 1, 1871, to January 1, 1874, the sum of $17,949.04; and on January 1, 1876, under the same circumstances of inequality, and while said undue power and influence of the plaintiff still existed, the defendants executed, at his request, the note mentioned in the complaint for $15,262.75 for interest on said five notes of $5,000 each, compounded annually at the rate of ten per cent. from January 1, 1871, to January 1, 1876.

That during the year 1872 the firm had largely extended the business and expended, with plaintiff's knowledge, con-

siderable sums in building, and changed their business from
wholesale to retail through commission agents, and thereby
placed a large. part of their assets where they were not
available to pay indebtedness maturing about January, 1873;
that they then applied to the plaintiff for additional loans,
and he, taking advantage of their necessities, demanded as
a condition of future loans that they should pay him twelve
and one half per cent. interest per annum on all moneys
which he should thereafter loan them, and placed the alter-
native before them to pay said rate of interest or then pay
their indebtedness to him; that, being unable then to pay
such indebtedness without destruction of their business, they
yielded to his demands, a full inventory of their property
and liabilities having then recently been taken upon the de-
mand of the plaintiff, from which it appeared that their
assets, at a low cash valuation, exceeded all their liabilities
by about $70,000; that in January, 1873, it was agreed that
the plaintiff should give time upon his existing demands and
should advance further sums, and the firm should pay inter-
est on all at the rate of twelve and one half per cent. per
annum; that some time prior to March 8, 1876, the agree-
ment was modified so that for the years 1874 and 1875 the
plaintiff should receive only twelve per cent. per annum;
that since January 1, 1873, the plaintiff has advanced, under
said agreement, the sum of $78,712.77, all of which sum, by
the method of application adopted in this report and here-
inafter stated, has been paid.

10. That the plaintiff, by his private secretary, has had espe-
cial charge of the books of the firms so far as his accounts
with them are concerned, and has from time to time, and
particularly in May, 1871, and again in 1874 and in 1876,
rendered accounts to them which were entered upon these
books by their book-keeper, and I do not find that any settle-
ment of said accounts was had or made, or that said accounts
became stated accounts under the circumstances of the case

stated in this finding; that said accounts of May, 1871, 1874, and 1876, each contained inequitable and oppressive charges for compound interest hereinbefore stated, and were so rendered and entered in all instances at a time when the same condition of inequality existed between the parties as stated in the ninth finding; that the said note for $15,262.75, dated January 1, 1876, was prepared by the plaintiff's agent, and was wholly for interest at ten per cent. compounded annually from January 1, 1871, to January 1, 1876, on the five notes of $5,000 each, and was presented by him to *T. G. Fish* for the signature of the firm, the said firm then being an applicant for forbearance, and that said *T. G. Fish* signed the name of the firm thereto.

11. That there never was any agreement that the plaintiff should be paid anything for the use of his name or credit.

12. That the two notes mentioned in the complaint dated February 1, 1876, one for $5,000, and the other for $4,627.77, the latter having indorsed thereon $2,562.36, June 1, 1876, and the two notes there mentioned dated January 29, 1877, one for $7,000, and the other for $8,000, were given for moneys advanced and loaned to the defendants at the dates of said notes respectively.

13. That Abner C. Fish disposed of his interest in the firm of Fish Brothers to the defendants *Edwin B. Fish* and *John C. Huggins*, substantially as stated in the answer.

14. That the statement of the account between the parties [annexed to the report] upon the principles hereinafter stated, shows that the entire sum now due from the defendants to the plaintiff is $81,175.09.

Conclusions of law:

1. That the relation that existed between the plaintiff and Fish Brothers, and Fish Bros. & Co., as to all the transactions in question, was that of debtor and creditor for moneys loaned and advanced by him to said firms respectively; that this relation which existed in the commencement, was not

changed by the execution sales nor by the so-called agency arrangement.

2. That the only interest which the plaintiff has or had in the aforesaid personal property and business, is and was as security for said indebtedness due him as aforesaid, and his interest is and was substantially that of a mortgagee for the amount actually due him.

3. The plaintiff is entitled to be allowed the charges for personal and clerks' services hereinbefore mentioned, to go into and become a part of the account, but is not entitled to recover anything on the account for the use of his name or credit.

4. The account between the plaintiff and each of said firms is open to examination and adjustment from the beginning.

5. Current payments and credits are to be applied first to the payment of current advances, and the account should be stated in the following manner: State the running account from its inception to January 1, 1871, computing interest at seven per cent. on both debit and credit items at that date, computing from the date of each item, and apply the credit balance, if any, to discharge the interest on the so-called forty per cent. account, and to the interest on the amounts secured by the chattel and real estate mortgages. If any credit balance still remains, the same should be applied to the discharge of the debit items of the running account of 1871 and 1872, so far as it will go, and if any credit balance still remains, it is to be applied on the principal of the forty per cent. account so called. The running account from and after January 1, 1873 (for loans and advances after that date), can draw no interest by reason of the aforesaid usurious agreement, the principal sum loaned and advanced having been fully paid by the payments thereafter made, and such payments should be applied, first to the discharge of the principal sums advanced subsequent to

January 1, 1873, after paying any balance, with seven per cent. interest, which may remain on the running account accruing in 1871 and 1872; the surplus, if any, should be applied to the interest on the forty per cent. account, to be computed at seven per cent., and on the notes of 1876 and 1877, computed at ten per cent., and on the notes for $27,000, computing interest at ten per cent. on $25,000, and at seven per cent. on $2,000. Should the payments be sufficient to pay the interest last named, a rest will be made; but if not, interest will be computed to the time of filing the report, and the payments then deducted. In stating said account, interest ought not to be compounded, and the plaintiff is not entitled to be allowed any sum in said account or otherwise for compound interest.

6. The $2,000 advanced about December 21, 1867, is to be considered as advanced under the provisions of the real estate mortgage, and should not be included in the running account. For the balance found due the plaintiff, $81,175.09, he is entitled to judgment against the defendants, and also to judgment declaring him to have an equitable lien upon the business therefor, and directing that the defendants pay into court, within seventy days from the entry of such judgment, said sum of $81,175.09, with interest from the date of this report upon $47,065.42, and in default of such payment a receiver be appointed, etc.; and that upon such payment being made, the plaintiff should be adjudged to surrender for cancellation said notes, bond, and mortgages, and to satisfy the judgments recovered on the claims purchased from creditors, and to convey to the defendants by quitclaim deed the real estate purchased from Heath, and to release to the defendants and to discharge all claim on the business and the property thereof.

7. In my judgment neither party is entitled to costs, but the actual disbursements should be taxed and paid by the parties in equal shares.

8. The note of $15,262.75, dated January 1, 1876, should be canceled.

9. Plaintiff is also entitled to judgment of foreclosure in the usual form against the real estate described in the real estate mortgage, for the sum of $7,000, with interest on $5,000 at ten per cent., and on $2,000 at seven per cent., from January 1, 1881; also to judgment of foreclosure and sale against the land purchased from Heath for the equitable mortgage thereon, consisting of the purchase price thereof, $900, with interest at seven per cent. from January 1, 1881, these foreclosure judgments only to be enforced in case the amount realized by the receiver from the personalty leaves a deficiency still due the plaintiff.

A motion on behalf of the plaintiff to set aside the report of the referee, and motions on behalf of each party to modify the same, were denied, and judgment was entered substantially in accordance with the report.

The plaintiff appealed from the whole of the judgment except so much thereof as adjudges that he is entitled to recover the charges for personal and clerk's services mentioned in the report, and that the mortgage executed by Fish Brothers, December 18, 1867, is a valid subsisting security to the plaintiff for $7,000. The notice of appeal states specifically that he does appeal from so much of the judgment as allows interest on $2,000 at seven per cent. only, and from so much thereof as adjudges that the sum of $2,000 was advanced under said mortgage.

The defendants appealed from the whole of the judgment except so much as adjudges that the relation between the parties was that of debtor and creditor, and that the plaintiff's only interest in the property and business was as security; that the plaintiff is not entitled to recover anything for the use of his name or credit; that the account is open to examination; that the $2,000 is to be considered as advanced under the real estate mortgage; that upon payment

·of the amount adjudged to be due, the notes should be delivered up and canceled, and that the bond and mortgage and the judgments recovered by the plaintiff be discharged, and the Heath property conveyed to the defendants; that the note for $15,262.75, dated January 1, 1876, is illegal and void; and that neither party is entitled to costs.

For the plaintiff there was a brief signed by *Jas. G. Jenkins* and *Wm. F. Vilas*, of counsel, and *C. H. Lee*, attorney, and the cause was argued orally by *Mr. Vilas* and *Mr. Jenkins.* They argued, among other things, that the absolute title to the personal property covered by the chattel mortgage passed to the plaintiff by his purchase at the execution sale, and that the defendants are estopped to assert the contrary or that the agreement then made in relation to the business was not as alleged by the plaintiff. It it well settled that an equity of redemption may be wholly surrendered by the holder, or may be modified, or entirely new terms agreed upon to define the rights of the owner. And when the course of dealing of the parties through a length of time has proceeded upon á different basis, the original theory of rights cannot be returned to and claimed. *Carpenter v. Carpenter*, 70 Ill., 457; *Sweet v. Mitchell*, 15 Wis., 641; *Shubert v. Stanley*, 52 Ind., 46; *Maxfield v. Patchen*, 29 Ill., 39; *Lawrence v. Dole*, 11 Vt., 549; *Leathe v. Bullard*, 8 Gray, 545; *Munroe v. Perkins*, 9 Pick., 298; *Trull v. Skinner*, 17 id., 213; *Ballard v. Walker*, 3 Johns. Cas., 60; *Fay v. Valentine*, 12 Pick., 40; *Racine Co. Bank v. Lathrop*, 12 Wis., 466; *Washburn v. Washburn*, 4 Ired. Eq., 306; *McCullough v. Roots*, 19 How., 349. When a deed is sought to be converted into a mortgage, or an equity of redemption established when the conveyance is absolute in terms, the proof must be such as to fix the fact " beyond any reasonable controversy." *Kercheval v. Doty*, 31 Wis., 491; *Lake v. Meacham*, 13 id., 355; *Kent v. Lasley*, 24 id., 654; *Waterman v. Dutton*, 6 id., 265; *Newton v. Holley*, id.,

592.   And this rule is equally applicable to conveyances of personalty, and to conveyances by judgment and record as well as by deed.   The parties and their privies are conclusively estopped by the records of the judicial sales. Those records show that on the Pratt execution the property was sold *subject to the chattel mortgage*, and that on the execution in favor of the plaintiff it was sold subject to the levy and sale under the Pratt execution.   Thus it was only the equity of redemption which was sold or purported to be sold, and, within the rule of *Sweet v. Mitchell*, 15 Wis., 641, parol testimony will not be admitted to establish a defeasance upon such a sale.   The agreement between the parties being as claimed by the plaintiff, it follows, (1) that the defense of usury cannot be entertained, for the statute of usury applies only to the pure relation of borrower and lender; (2) that the settlements between the parties cannot be impeached because made upon annual rests of account. When two join in a business enterprise they may adjust their profits upon whatever basis of division they see fit, and in the absence of fraud or mistake their accounts will not be surcharged.   And if it be agreed that the profits of one shall take the form of a percentage upon the capital, that percentage is not *interest* in the meaning of the law, but a *dividend* of gains only, however it be called.   *Anderson v. Maltby*, 2 Ves. Jr., 244.   This is still plainer where the business and property belong to *one*, and the percentage is fixed as the line to mark the time of beginning of the other's contingent gains as agent.   It follows, also, (3) that it is unnecessary that there should have been any written promise that the plaintiff should have ten per cent. interest on his capital.

Even if the transaction between the parties partook so much of the nature of a loan that as between the plaintiff and Fish Brothers they were liable to him for the money furnished to the business and for any losses sustained by him in

the business, yet it cannot be denied that he was liable, as principal, to all the creditors of the concern and for every obligation contracted by it. His engagement was, therefore, not a mere loan, and the relation was not merely that of debtor and creditor, and the statute against usury cannot apply. See Fereday v. Hordern, 1 Jac. Ch., 144; Gilpin v. Enderbey, 5 Barn. & Ald., 954; Anderson v. Maltby, 2 Ves. Jr., 244; Morisset v. King, 2 Burr., 891; Hammet v. Yea, 1 Bos. & P., 144; Ketchum v. Barber, 4 Hill, 224; Payne v. Freer, 25 Hun, 124; Collyer on Part., §§ 64–68; Tyler on Usury, 185 et seq.; Quackenbush v. Leonard, 9 Paige, 346; Hall v. Daggett, 6 Cow., 653; Burbidge v. Cotton, 8 Eng. L. & Eq., 57; 3 Jarman & Bythewood on Conveyancing, 400–404. But, even assuming that the plaintiff was a lender and the defendants borrowers of the money advanced to carry on the business, no usury was exacted or demanded. If, in addition to lending money, the lender renders, pursuant to contract made at the time of the loan or on subsequent request, his own personal service or the services of his own servants or agents paid by him, it is not additional interest for the use of his money when he is paid a fair compensation for such services. 3 Parsons on Con., pt. II, ch. 7, sec. 9, and note; Palmer v. Baker, 1 Maule & S., 56. And a lender may, in addition to lawful interest, contract to take and collect a reasonable commission for any peculiar trouble and expense in respect to the loan. Hammet v. Yea, 1 Bos. & P., 153; Carstairs v. Stein, 4 Maule & S., 192; Brooke v. Middleton, 1 Camp., 445; Masterman v. Cowrie, 3 id., 488; Auriol v. Thomas, 2 Term, 52; Ketchum v. Barber, 4 Hill, 224; Central Bank v. St. John, 17 Wis., 157; Cornell v. Barnes, 26 id., 473; Tyler on Usury, ch. XI; Cockle v. Flack, 93 U. S., 345; Mathews v. Coe, 70 N. Y., 245; De Forest v. Strong, 8 Conn., 513. And the lender may, in addition, lend or sell his credit for a compensation. Oakley v. Boorman, 21 Wend., 588; Beckwith v. Windsor Manuf'g Co., 14 Conn.,

Case vs. Fish and others.

594; *Hutchinson v. Hosmer*, 2 id., 341; *Masterman v. Cowrie*, 3 Camp., 488; *Ketchum v. Barber*, 4 Hill, 224; *More v. Howland*, 4 Denio, 264; *Trotter v. Curtis*, 19 Johns., 160; *Dry Dock Bank v. Trust Co.*, 3 Coms., 355–357; 3 Parsons on Con., pt. II, ch. 7, pp. 148, 149; *Otto v. Durege*, 14 Wis., 571. In determining whether or not there is usury in a mixed transaction, the first point of inquiry is the intention of the parties, or, more particularly, of the lender. *Otto v. Durege*, 14 Wis., 571; *First Nat. Bank v. Plankinton*, 27 id., 177. And the proof of usury must be clear and satisfactory, not a mere preponderance. *Hale v. Haselton*, 21 Wis., 320; Tyler on Usury, 122, 256, 357, 469.

The only objection to the accounting was that interest was compounded, or that the account was adjusted by annual rests. But compound interest cannot be said to be usurious. *Mosher v. Chapin*, 12 Wis., 453; *Camp v. Bates*, 11 Conn., 487; *Meeker v. Hill*, 23 id., 574; 3 Parsons on Con., pt. II, ch. 7, sec. 13; *Austin v. Bacon*, 28 Wis., 416; *Stewart v. Petree*, 55 N. Y., 621; *Otis v. Lindsey*, 10 Me., 315; *Wilcox v. Howland*, 23 Pick., 167; *Breckenridge v. Brooks*, 2 A. K. Marsh., 335; *Kellogg v. Hickok*, 1 Wend., 521. An agreement to pay interest upon interest, after it is due, is not immoral or unconscionable, although made at the time of the original contract, and if made in writing, as required by sec. 1689, R. S. (ch. 160, Laws of 1868), will be enforced. That was the rule of computation adopted prior to the statute, whenever payment of interest was promised at stated periods, even without a promise to pay interest on over-due sums. *Mills v. Town of Jefferson*, 20 Wis., 50. See, also, *Selleck v. French*, 1 Am. L. Cas., 538–9, and notes; *Preston v. Walker*, 26 Iowa, 205; *Mann v. Cross*, 9 id., 327. It is settled that an agreement to pay compound interest imposes a moral obligation, and that a settlement of accounts upon that basis will stand, and the balance draw interest, and that a note given for the accrued interest so computed upon

a debt is valid.   And where there has been a special agree-
ment after the interest became due to pay interest upon it,
or where there has been a settlement between the parties of
their account, interest upon the balance has been agreed to
be collectible by the most extreme of the equity cases.  *Con-
necticut v. Jackson*, 1 Johns. Ch., 13; *Van Benschooten v.
Lawson*, 6 id., 313; *Mowry v. Bishop*, 5 Paige, 98; *Guernsey
v. Rexford*, 63 N. Y., 631; *Mueller v. McGregor*, 28 Ohio
St., 273.  Mercantile and bankers' accounts are, in all cases,
excepted from the rule of computation upon simple loans;
and the usage or course of dealing of the parties to calcu-
late interest upon the account at stated periods and add it
to the principal, and the rule that accounts should be settled
and adjusted upon that basis when it has been previously
adopted in the mutual dealing, are supported by the authori-
ties without exception.  1 Am. L. Cas., 540; *Bainbridge v.
Wilcocks*, 1 Baldw., 536; *Eaton v. Bell*, 5 Barn. & Ald., 34;
*McClelland's Ex'r v. West's Adm'r*, 70 Pa. St., 183; *Isett v.
Oglevie*, 9 Iowa, 313; *Ex parte Beavan*, 9 Ves. Jr., 223;
*Clancarty v. Latouche*, 1 Ball & B., 420; *McCarthy v. Llan-
doff*, id., 375; *Newell v. Jones*, 4 Car. & P., 124; *Bruce v.
Hunter*, 3 Camp., 467; *Hollister v. Barkley*, 11 N. H., 501;
Comyn on Usury, 150, 151; Pulling on Mercantile Ac-
counts, 12, 58.

   For the defendants there were briefs by *Fish & Dodge*, as
attorneys, and *John T. Fish* and *S. U. Pinney*, of counsel,
and oral argument by *Mr. Fish* and *Mr. Pinney*.  They
contended, *inter alia*, that the plaintiff's title was a mere
security for his debt and money advanced, and the effect of
the agency arrangement was to put him in the position of a
mortgagee in possession.  Whenever property, real or per-
sonal, is transferred to secure the repayment of money
loaned, the transaction will be held to be a mortgage, what-
ever the form of the instrument, and whatever the means
employed for passing the title.  *Sweet v. Mitchell*, 15 Wis.,

641; *Wilcox v. Bates,* 26 id., 465; *Paine v. Wilcox,* 16 id., 202; *Starks v. Redfield,* 52 id., 349; *Brown v. Dewey,* 1 Sandf. Ch., 56; *Sweetzer's Appeal,* 71 Pa. St., 264. And the transaction will continue to be a mortgage until there has been a fair sale of the equity of redemption for a full consideration actually paid; and the burden of showing this is upon the mortgagee. If it appear that the securities were retained and the debt treated as still existing, no form of instrument will have the effect to cut off the equity of redemption and change the relation. *Brinkman v. Jones,* 44 Wis., 498; *Conway's Ex'rs v. Alexander,* 7 Cranch, 218; *Villa v. Rodriguez,* 12 Wall., 323, 339; *Peugh v. Davis,* 96 U. S., 332. If it were conceded that there was no promise or liability on the part of Fish Brothers to repay the money, the transaction might still be a mortgage. The question is whether the vesting of the title in the plaintiff "was a security for the repayment of money," and if it was "the security may properly be invalidated for usury." *Horn v. Keteltas,* 46 N. Y., 606. And in doubtful cases the transaction will be held a mortgage instead of a conditional sale. *Mathews v. Sheehan,* 69 N. Y., 585. Here there was a condition under which the title, on payment, was absolutely to be revested in Fish Brothers, and not to remain in the plaintiff. *Macaulay v. Porter,* 71 N. Y., 179; *Morris v. Budlong,* 78 id., 543; *Brinkman v. Jones,* 44 Wis., 517. If the business had been a failure and resulted disastrously, the defendants would have been liable to the plaintiff for the amount of the claims of creditors which in that event he would be obliged to pay. The business was theirs, and the payment by him would have been for their use and at their request. Though as to creditors he would be a principal debtor, as between himself and the defendants the relation was one of suretyship. *Exall v. Partridge,* 8 Term, 308; *Hunt v. Amidon,* 4 Hill, 345; *Rodman v. Denison,* 21 Conn., 406; *Cuyler v. Ensworth,* 6 Paige, 32; 1 L. C. in Eq., 153, 154; 2

Case vs. Fish and others.

id., 231; 2 Am. L. C., 164; *Hayes v. Ward*, 4 Johns. Ch., 123; *Cottrell's Appeal*, 11 Harris, 294; *Burns v. Bank*, 1 Penn., 395. And see *Morse v. Wilson*, 4 Term, 353. As to the cases of *Gilpin v. Enderbey*, 5 Barn. & Ald., 954, and *Fereday v. Hordern*, 1 Jac. Ch., 144, see 1 Lindley on Part. (Ewell's ed.), 23; *Radcliffe v. Rushworth*, 33 Beav., 484; *Brophy v. Holmes*, 2 Molloy, 1; *Smith v. Garth*, 32 Ala., 368.

The agreement of January, 1869, was for usurious interest, though under the guise of personal and clerk's services. No services are shown to have been rendered except such as are incident to the loan of money and obtaining security. The plaintiff was mortgagee in possession of the property included in the mortgages, and for making collections and obtaining his money out of the property he could make no charge in addition to interest. *Scott v. Brest*, 2 Term, 238; *Palmer v. Baker*, 1 Maule & S., 56; *French v. Baron*, 2 Atk., 120; *Bonithon v. Hockmore*, 1 Vern., 316; *Godfrey v. Watson*, 3 Atk., 518; *Chambers v. Goldwin*, 5 Ves. Jr., 834; 9 id., 271; *Hine v. Handy*, 1 Johns. Ch., 6; *Moore v. Cable*, id., 385; 4 Kent's Comm. (5th ed.), 156; *Breckenridge v. Brooks*, 2 A. K. Marsh., 335; *Reed v. Catlin*, 49 Wis., 692; *Patterson v. Donner*, 48 Cal., 380; *Bank of Woodland v. Treadwell*, 55 id., 379; 2 Jones on Mortg., 1606.

Compound interest is discountenanced in equity, and in taking and stating accounts will not be allowed. *Mosher v. Chapin*, 12 Wis., 458; *Thornhill v. Evans*, 2 Atk., 330; 1 id., 304; *Van Benschooten v. Lawson*, 6 Johns. Ch., 313; *Young v. Hill*, 67 N. Y., 162; *Tompson v. Leith*, 4 Jur. (N. S.), 1091; *Breckenridge v. Brooks*, 2 A. K. Marsh., 335.

Cole, C. J. In the examination of these appeals it is essential, at the outset, to ascertain, if possible, the real relation which the parties held to each other during the period covering the transactions to be considered. The defense of usury must turn principally upon the view which is taken

of that relation. On the part of the plaintiff it is claimed, in brief, that pursuant to a verbal agreement entered into about the time of the judicial sale, in March, 1868, it was understood that he should, by that sale, become the absolute owner of the personal property and effects of Fish Brothers; that thereafter the business of manufacturing wagons at their establishment, in Racine, was to be conducted by him as principal, the Fish Brothers managing it as his agents; that he was to furnish the necessary means and use his personal credit in carrying on the business, until such time as he should receive from the avails thereof the money which he had paid and become liable to pay to buy the debts of Fish Brothers, and all his advances to the business, with annual interest at the rate of ten per cent. per annum, and the amount of their indebtedness to him for loans, represented by notes which he then held, with like interest, and reimbursement for his services and expenses; that in the meantime the Fish Brothers were each to receive from the proceeds of the business $100 per month for their living expenses, and in the end were to have and own whatever was earned or saved in the undertaking,— over and above such expenses and the amount which he was entitled to receive,— together with all the property and assets of the concern. On the part of the defendants it is claimed that the simple relation of debtor and creditor, or mortgagor and mortgagee, always existed between the plaintiff and Fish Brothers, and parties deriving an interest under them, and that the rights and liabilities of the respective parties must be determined by the principles of law applicable to such a relation. This claim, of course, implies that Fish Brothers continued to be the real owners, or at least the mortgagors in possession, of the personal property and assets of the firm; that they controlled the business for themselves as principals, and for their own benefit, the plaintiff loaning them money from time to time to carry it on as they might need.

This contention of the defendants is entirely irreconcilable with the facts of the case as we understand them, and with the manner the business was conducted for several years after the early part of March, 1868. Undeniably the plaintiff held, in December, 1867, a chattel mortgage on all the personal property and effects of Fish Brothers, to secure the payment of $20,000 which he had loaned them and for which he held their notes. He had likewise a mortgage on their real estate to secure another loan, but that debt and security may for the moment be laid out of view, for the purpose of the argument we are now considering. In March, 1868, it is admitted a sale of the personal property of Fish Brothers — subject to the plaintiff's mortgage — was made under the Pratt judgment, and the judgments which the plaintiff had obtained on a portion of their debts which he had brought up pursuant to the compromise arrangement. The plaintiff bid in all the property sold at these sales, paying the Pratt judgment in full. What was the object of these judicial sales? What purpose or end was intended to be subserved or secured by them? The plaintiff's contention is that the object was to transfer and vest in him the absolute title to the property sold, in order that the business might be thereafter carried on as his own, but under the management of Fish Brothers as his agents, until he should be paid out of the business or by them his debts and expenses as above stated. This certainly gives some legal effect — some rational meaning — to those sales. But according to the claim of the defendants the sales really amounted to nothing; they did not change the relation of the parties in the least; were simply a sham, only designed to force reluctant creditors to come into the compromise arrangement. The plaintiff already held the title to the personal property as security by his chattel mortgage. He, therefore, gained nothing by going through the formality of a judicial sale unless he acquired whatever right the Fish Brothers had in the property.

But it is said the *onus* was on the plaintiff of showing that the legal relation of the parties had been changed; that from a mortgagee of chattels he had become the absolute owner by a purchase of the equity of redemption at a fair sale, and that this was so understood by both parties, and that the relation of mortgagor and mortgagee in respect thereto should cease. The plaintiff does show all this by proof which seems to us overwhelming and conclusive. But before we proceed to notice some of that evidence which shows that the relation of the parties was changed, and was intended to be changed, by those judicial sales and the agreement entered into about that time, let us consider for a moment the position of the plaintiff, according to the defendants' theory of the case. The plaintiff was the mortgagee of chattels which were in the possession of Fish Brothers, the mortgagors. The latter had the right to go on and manufacture into wagons the materials and stock on hand,— which constituted a large portion of the mortgaged property,— sell such wagons, and with the proceeds buy other materials and stock, and so continue the business. What would become of the property specifically mortgaged after it had thus been manufactured into wagons and the wagons sold? Excepting the tools and machinery covered by the mortgage, would a vestige of it remain to which the mortgage would attach or upon which a lien would exist? Or is it claimed that the mortgage was a floating one, which changed and attached, contracted and expanded, as the stock and materials used in the business should change, contract, or expand?

No one understands better than the very able and intelligent counsel for the defendants that such a mortgage would not be valid, nor create any lien, legal or equitable, in this state. For the rule established by this court in many well-considered cases is "that a chattel mortgage of after-acquired goods does not create a lien, legal or equitable, by force of the mortgage, upon after-acquired goods." RYAN, C. J., *Hunter v. Bosworth*, 43 Wis., 583–591. So it would follow,

on defendants' theory of the relation existing between the parties, that in a few weeks or months the plaintiff's security would be wholly lost. Most of the specific chattels included in the mortgage would have been manufactured into wagons, the wagons sold, and the property absolutely gone beyond the power of the mortgagee to identify or recover the same. This is the fatal vice in the argument of counsel, as we regard it, in attempting to apply to the chattel mortgage in question the same rules of law which control as to a mortgage of real estate, or a mortgage of specific chattels which are intended to remain in substantially the same condition as when the lien is created. In this case there is no pretense that the parties expected the stock and materials should remain in the condition they were when mortgaged, or when the judicial sales took place. And if the defendants had an equity of redemption in the mortgaged property, what became of it, or to what property did such equity attach under the circumstances in this case? But we pass on.

There does not seem to have been any change in the legal relation of the parties after the failure of Fish Brothers, and while the compromise agreement was being consummated. The Fish Brothers expected some satisfactory arrangement would be made with their creditors, and, by such aid as the plaintiff had offered to render them, they would be enabled to resume business and carry it on as before until their stock was worked up and debts paid. But in that expectation they were disappointed, in consequence of the action of some of their creditors, who refused to come into the compromise. But the stock and material on hand when the chattel mortgage was given remained in their possession; some new material was purchased by the plaintiff for them, so that they could finish some wagons; and doubtless some material was worked up, but how much does not appear. The plaintiff advanced them some money on the real estate mortgage to pay workmen, and these accounts were assigned

to him.   But there was no material change in the manage-
ment of the business until after the judicial sales.   Soon
after these sales a new set of books was opened, an inven-
tory of the property on hand was taken, and this entry was
made in the books: "Inventory of the effects of *J. I. Case*
as principal, and *T. G.* and A. C. Fish as agents, under
the name and style of Fish Bros., Agents, on commencing
business in the manufacture of wagons, carriages, etc., on
State street.   Inventory of wagon material, machinery, and
fixtures, as per inventory book, $45,543.27; office furniture,
$554.   Total, $46,097.27."

At about this time the plaintiff claims he went into the
actual possession of the property purchased at the sales, be-
came the absolute owner thereof according to the terms and
conditions of the agreement he had made with Fish Brothers,
which has been already mentioned.   Indisputably, from that
time all purchases of material were made upon the individual
credit of the plaintiff, who held himself out to the world as
principal, and responsible for all the debts and liabilities of
the concern.   Also it is admitted that the financial business
was removed to the plaintiff's private office, quite a distance
from the office of the concern, and was there attended to by
the plaintiff or by his private clerk.   All collections, all pay-
ments, the handling of the money of the concern, were at-
tended to by the plaintiff or by his clerk.   The plaintiff
assumed the right to advise and control as to the way the
business should generally be conducted; he assumed the
right to fix the amount of salary which each of the Fish
Brothers should have or withdraw from the business for
their expenses; he assumed the right to fix the salary of
the book-keeper and to discharge employees.   His right
or authority to do these things, to control the business
as he did, was not challenged in any way by the Fish
Brothers, or either of them.   On the contrary, they held
themselves out to the world as acting as his agents in the

business, so described themselves in business letters, statements of account, shipping bills, etc. Most of the above facts are admitted to be true. That being so, with what reason can it be seriously claimed that they do not show an essential, radical, and important change in the relation of the parties and in the management of the business?

It will be borne in mind that this was the way in which a large business was conducted for years — a business which involved the plaintiff in personal liabilities to the amount of several hundred thousand dollars annually some years. How idle, then, to say, in view of these indisputable facts and of others which might be alluded to, having the same bearing, that the relation between the plaintiff and Fish Brothers, and Fish Bros. & Co., was simply that of mortgagor and mortgagee, or that of debtor and creditor. It is true, while neither of the Fish Brothers deny the fact that the business was conducted in the manner above stated for years, they do pretend the "agency arrangement," as they call it, was merely a cover, so that the plaintiff should be secure as to outside parties while they went on and worked up the stock as before, and should pay the plaintiff his claims and advances, with interest. But the accuracy of that statement is most conclusively disproved, as well by their own conduct as by all the facts and probabilities of the case. That they were to own the business when they had satisfied all the claims of the plaintiff according to the agreement, and had relieved him from the liabilities which he had incurred in its management, is precisely what the plaintiff claims. But how the "agency arrangement," if not real, but a sham, would inure to his advantage or security, when he was personally responsible for every dollar of indebtedness contracted in carrying on the business, is a matter not explained and is difficult of explanation. But, as already intimated, the statement of the defendants in that regard cannot be accepted as correct.

Accepting as substantially correct — as we are disposed to do — the agreement as claimed by the plaintiff, there was much discussion as to its legal effect, and the rights of the parties under it. On the part of the plaintiff, it was said the engagement entered into was in the nature of an agency coupled with an interest, or a *quasi*-partnership where the title and ownership were in the plaintiff, as principal, until the defendants should be entitled to have the property and business as their own by the extinguishment of plaintiff's claims and liabilities. It is not denied that the defendants had rights in the business which the plaintiff could not ignore, and which a court of equity would protect. The plaintiff could not, by reason of his superior interest, take advantage of the defendants, or dismiss them at will from the management of the business. But it is not easy to define the real relation of the parties under the agreement. It would not essentially aid us in the solution of the questions involved, if we should attempt to do so, and try to properly classify the engagement. The parties' rights rest upon the contract which they have made. It is peculiar in many of its features. In some aspects it is much like a partnership, though there was to be no communion of profit. But it is a grave question, if the business had turned out unprofitable, whether the plaintiff would not have lost all advances which he had made on its faith and credit. Our present impression is that he would; that he trusted the business alone for the return of such advances. If there was an obligation on the part of the defendants to pay these advances, such liability was "anomalous" and "peculiar." But it clearly appears that the plaintiff held himself out to the world as the responsible party in the business. All debts were contracted with him as principal. He retained the entire control of the finances. The defendants, not ostensibly but really, acted as his agents in its management. These are features which distinguish the engagement from an ordinary partnership, where

each partner has power to bind the firm by simple contracts relating to the business, to receive debts due the firm, and to share in the profits and losses. But whether the engagement in question created an agency coupled with an interest, or a quasi-partnership, or a quasi-trust, certain it is the parties could fix their obligations and duties under it. It was a lawful contract to carry on a lawful business in a lawful way, and the parties should abide by the terms of the agreement which they have made.

The plaintiff did not agree to continue the business for any length of time; but he did agree to furnish whatever money should be necessary to carry it on, no amount being specified. The expectation seems to have been that by good management the business would pay the plaintiff's claims within two or three years, when the Fish Brothers would be entitled to have and own it, with whatever had been saved or made out of it. But that expectation, it seems, was not realized. The business was conducted in the manner as indicated, the plaintiff furnishing all necessary means for the purpose, or using his credit at the banks to procure discounts as needed. The volume of business was largely increased. In January, 1869, the plaintiff claimed and charged in account, as compensation for his personal services and clerk hire for 1868, $2,000; for 1869, $1,500; for 1870, $1,250; and for 1871, $1,250. These charges were over and above ten per cent. interest on all advances which he had made to the business, on all moneys which he had paid to buy up the debts of Fish Brothers, and on their notes which he held. That rate of interest he exacted, and it was allowed him on these several amounts. The plaintiff says that all these charges for compensation for personal services and clerk hire were made by arrangements at different times with Fish Brothers, or one of them, who consented and agreed to them.

The defendants allege in their answer, and offered proof

to sustain the allegation, that the plaintiff, knowing that they were unable to discharge their indebtedness to him, about January 27, 1869, demanded and required that they should agree to pay and pay, as and for interest upon all their indebtedness then contracted or to be contracted, interest at the rate of twelve and one half per cent., and that the above charges were a mere shift or device for exacting usurious interest, which, in their straitened circumstances, they were compelled to accede to and did agree to pay. This presents the first defense of usury which we have to consider. Now we have just stated that in our view, after the judicial sales and agreement, the parties did not stand to each other in the simple relation of debtor and creditor or mortgagor and mortgagee. The Fish Brothers, after that time, were not the owners of the business and property as they claim. The plaintiff became the owner, and carried it on in his name, as his own, under their management as agents. Therefore, whatever advances he made were not by way of loans to the defendants which they undertook to repay, except as they gave their notes, as they did for advances February 1, 1876, and January 29, 1877. But as to other advances to the business they made no express promise to repay them. Of course they would not be entitled to have the business and property as their own unless they paid these advances, with other indebtedness, together with interest at the agreed rate. But that is another matter not affecting the question of usury. If the defendants had really been the owners of the business and the plaintiff had made advances to carry it on, doubtless they would be liable for the amount on an implied *assumpsit*, if there were no express promise. Such was not the position of the parties.

It seems to us the usury laws have really no application to the transactions under review. The plaintiff made advances under the agreement to carry on the business, and became liable for every debt that was contracted. This is

an incontestable fact. The defendants do not deny his personal responsibility to every creditor of the concern, and the evidence shows that he did give the business more or less personal attention; that his own clerk attended to it; that in some years he actually incurred liabilities about the business amounting to a half million of dollars. It is obvious that this was not a simple loan by the lender to the borrower. It is not a case where more than lawful interest is exacted for the simple use of money. That is the transaction which the statute condemns. Nor is there any ground for saying that the transactions took the form they did as a shift or device to cover usury. The parties had the undoubted right to agree as to what compensation the plaintiff should receive out of the business for his personal services and the services of his clerk. Such an agreement having been fairly made, what principle of law or morals will be violated if effect is given to it? Neither in form nor in substance did the transaction amount to a loan and borrowing, or a forbearance of money.

The referee and circuit court, while holding that the only interest which the plaintiff had in the personal property and business was as security for the indebtedness due, yet were of the opinion that the charges for personal services, etc., above alluded to, were legal, and were not a cover for usury exacted on loans. In that view we fully concur. But in respect to another claim of the plaintiff the defense of usury was sustained. Owing to changes in the manner of conducting the business, the concern became embarrassed, and in 1873 the plaintiff was applied to for additional advances to carry it on. The evidence shows that with great reluctance, after having taken an inventory of the assets, and having investigated the condition of the concern, he did advance $75,000, or thereabouts, to carry it on. It is alleged on the part of the defendants, and proof was given tending to support the allegation, that the plaintiff, taking advan-

tage of defendants' necessities, demanded and required, as
a condition of all further advances, that they should pay
him twelve and one half per cent.interest on all sums which
he should advance, and that they were compelled to agree
to do so.  According to the theory of the defendants as to
the relation of the parties, such a contract would, doubtless,
be illegal; that is, if they were really the owners of the con-
cern, and that rate of interest was exacted merely as a com-
pensation for the use of money loaned, there being no other
element of risk except the responsibility of the borrowers
entering into the transaction.  But such a theory of the
case we reject as not supported by the facts and conduct of
the parties.  The plaintiff made these advances, as he had
others, on the credit of the business, not as loans to the de-
fendants.  The business at the time was really his, subject
to the right of the defendants to become the owners.

The plaintiff says that in no event was he to receive more
than ten per cent. interest on his money, and that the excess
was charged as compensation for personal and clerk's serv-
ices, and the use of his credit.  Such charges were made in
account for the years 1873, 1874, and 1875.  The plaintiff
says that the charges as to each year were pursuant to an
arrangement made with one of the defendants.  Much stress
was laid upon the fact that in the entry in the plaintiff's
books for 1873 the charge was for interest at twelve and
one half per cent., thus, it is said, rebutting the inference
that the parties understood the excess was for personal and
clerk's services.  The plaintiff also stated that the use of
money was worth more than ten per cent., and that more
than that rate could be obtained for it in Chicago and Min-
nesota.  But the entry and these statements are satisfactorily
explained in the evidence.  They would be entitled to much
weight as tending to prove usury, if the relation of the par-
ties was that of borrower and lender.  As it is they have little
or no significance.  If the business had resulted disastrously

would not the plaintiff have lost his advances? Could not the defendants, if repayment had been demanded, have said: " We did not promise to make good these advances; they were made under the agreement by which the business and property became yours until such time as we should be entitled to have them by paying you all indebtedness and charges. We were managing the business for you, as your agents; we have assumed no liability for the debts of the concern, either to you or to third parties. We surely have entered into no express obligation to pay the principal or interest, except in two instances." Now this they might well have said under the arrangement for conducting the business. Such being the case, what ground is there for predicating usury on the transaction of 1873 any more than upon that of 1869? We can see no material difference in the cases.

It need not be remarked that to constitute usury within the prohibitions of the statute there must be an intention knowingly to contract for and take more for the mere use of money than the law allows. There necessarily enters into the transaction a loan, where the principal is to be repaid, with illegal interest by way of compensation for the use of the principal. That cannot be said was the real transaction as to any advances agreed to be made in 1873. The plaintiff not only risked the advances, but he had incurred and continued to rest under vast liabilities for the concern besides.

In case of an actual partnership, where there is a risk that the principal contributed may be lost, an advantage to be taken out of the trade may be measured in any way agreed on without subjecting the arrangement to the charge of usury, because the money is not lying at interest, but is employed in making profits, subject to losses. Tyler on Usury, 185; *Fereday v. Hordern*, 1 Jac. Ch., 144; *Gilpen v. Enderbey*, 5 Barn. & Ald., 954.

The head-note states the case of *Fereday v. Hordern* as follows: "Deed by which A., B., and C., partners in trade, in consideration of £4,000 paid to them by D. in augmentation of their capital, agree to admit him into partnership with them for a term. It was agreed that D. should receive in lieu of profits a clear sum of £550 per annum, and all the property of the concern was charged with the payment of this sum quarterly, and of the £4,000 at the determination of the partnership. A., B., and C. were to pay rent, taxes, wages, and the other outgoings of the trade, which was to be carried on by them, and in their names only; and D. was not to be required to attend to it. D. was at liberty to retire on giving twelve months' notice; and on his retiring, or at the end of the term, the £4,000 and the arrears (if any) of the £550 per annum were to be paid to him by A., B., and C. by instalments, to be secured by their bonds, and they were to indemnify him from the debts of the partnership." Lord ELDON held this deed not usurious.

In *Gilpen v. Enderbey,* " by deed A. and B. covenanted to become partners in the business of army clothiers for ten years, and that A. should advance £20,000 as part of the capital for carrying on the business, and that B. should find a like sum; that A., during the continuance of the partnership, should have out of the profits, if sufficient, and if not, out of the capital, £2,000 yearly for his share of the profits. B. then covenanted that, on the determination of the partnership by effluxion of time, the sum of £20,000 should be repaid to A.; that B. should guarantee all debts and pay all losses. In an action brought upon this deed to recover the £20,000 at the expiration of ten years, the defendant pleaded that the deed was executed, by way of shift, in pursuance of an usurious agreement. That plea, upon issue joined, was negatived by the verdict of the jury, and judgment was given by the court of C. B. for the plaintiff. Held, upon error in K. B., that after that finding the deed must be

taken to disclose the real intention of the parties, and that it was not in that case void upon the ground of usury."

Other authorities of a similar import might be referred to in this opinion, but will not be, as they will be found on the brief of plaintiff's counsel. Of course, the principle of these authorities does not apply where the real nature of the contract is a loan, and not a partnership, as was held in *Morse v. Wilson*, 4 Term, 353; *Cooper v. Tappan*, 9 Wis., 362; and that class of cases.

Mr. Collyer says: "The better opinion, however, is that an agreement having the form of a partnership agreement, but in which profits beyond the legal rate of interest are reserved to one of the parties, is legal, unless it appears to have been executed by way of shift or contrivance to cover usury, because at all events the principal, for which such profits and interests are taken, is hazarded to third persons." Law of Partnership, (6th ed.), § 68. It is obvious that the principle of contingency or hazard applies with far greater force here than in a case of actual partnership. But it seems unnecessary to dwell longer upon the question of usury; for, under the arrangement for conducting the business as we have assumed it to be, the usury laws have no application to the case.

There is one piece of testimony which ought, perhaps, to be noticed, for it militates against the views we have expressed, and seems inconsistent with them. We refer to the notes which were given the plaintiff for advances February 1, 1876, and January 29, 1877. If he was the real owner of the business, it is certainly strange that his agents should give notes for advances to carry it on. The plaintiff gives an explanation of the object in taking these notes, but the reason assigned is not very satisfactory to my mind. But still no such weight or importance should be attached to these exceptional acts as to countervail or destroy the general tendency and effect of the evidence in the case, for the method

of conducting the business through a series of years, the numerous acts and declarations of the parties as to their relations, force us irresistibly to the conclusion that the relation of debtor and creditor did not exist in the management of the business.

There is no sufficient reason shown for disturbing the settlements which were made from time to time by the parties. The accounts on both sides were more than once looked over, examined, and adjusted.    The result of such settlements, or the balance found due, was entered on the books kept by the defendants.    The proof is perfectly conclusive on this point. Now, what fact is shown to impeach the correctness of these settlements?    What error, mistake, or fraud does it appear was committed in making them?    The charges for personal and clerk's services were agreed upon and allowed.    We have seen there was no legal objection to such charges, especially where the parties agreed as to the amount.    It is true, compound interest entered into these settlements, but that affords no reason — as we shall presently see — for opening them. The principle or rule of law applicable to a stated account or settlement, applies with full force to these settlements which were made.    That rule, as often stated by this court, is that a settlement once deliberately made is not to be opened except upon the clearest and most positive proof of fraud or mistake therein.    *Martin v. Beckwith,* 4 Wis., 219; *Marsh v. Case,* 30 Wis., 531; *Kercheval v. Doty,* 31 Wis., 476; *Wilson v. Runkel,* 38 Wis., 526; *Hoyt v. McLaughlin,* 52 Wis., 283; *Klauber v. Wright,* id., 303.

The first reason given for opening these settlements is that the defendants were completely in the plaintiff's power, and were compelled to acquiesce in their correctness, otherwise the plaintiff would break up and destroy the business. We do not think this shows a good reason for setting the settlements aside.    Suppose an actual partnership had existed which could be dissolved at the will of either partner, and

that full settlements had been made between the partners. Would the fact that defendants apprehended the plaintiff would withdraw his capital, unless they acquiesced in the correctness of the settlements, constitute a sufficient ground for opening them, no mistake or fraud being shown in respect to them? It seems to us not. And still there would be the same moral duress in that case as in this. But the truth is, there is no duress or compulsion shown which should open the settlements. They were fairly made by parties competent to make them, and are binding as to the matters embraced in them. Another objection taken to the fairness of the settlements is that the interest was compounded, or the accounts were adjusted with annual rests. This was the ground on which the referee and court below set aside the earlier settlement. But it is well settled that an agreement to compound the interest does not render the contract usurious. Tyler on Usury, 240, 244. A contract for interest upon interest was not favored by the ancient authorities, mainly because it was deemed a hard and oppressive exaction. Courts refused to enforce such a contract on grounds of public policy. *Mosher v. Chapin*, 12 Wis., 453. But that rule has been greatly relaxed in many modern cases. Where it appears that the parties have adjusted their accounts, have agreed that interest due shall be turned into principal and draw interest, this court has adhered to the doctrine that such a transaction was not illegal or wrong. *Austin v. Bacon*, 28 Wis., 416.

In the case before us there were a great many items of indebtedness on both sides which were adjusted and the balance struck. The interest on the notes, on the "forty per cent." account, and on the current account was computed, and also the interest upon the items upon the other side of the account. These settlements were voluntarily made; no error or fraud is shown in respect to them; the defendants were under no such duress or coercion as should avoid them;

and under the circumstances the settlements must stand, notwithstanding compound interest is included in them. Of course, the note for $15,262.75, dated January 1, 1876, given for interest due, is perfectly valid. There was a good consideration to sustain that note, even within the opinion of the majority of the court in *Young v. Hill*, 67 N. Y., 162. There was a forbearing and giving day of payment of money due, which was a good consideration. The plaintiff says that he was to have interest upon his entire indebtedness annually. "Interest was justly and equitably due at the end of each year; and if the debtor, instead of paying it, gives his note or bond for it, there is no legal objection to enforcing its payment. If the interest is carried into an account current, and the debtor gives his note for the balance of his account, it stands in principle on the same footing." SUTHERLAND, J., in *Kellogg v. Hickok*, 1 Wend., 521; *Tylee v. Yates*, 3 Barb., 222. It is said that our statute declares that in the computation of interest upon any bond, note, or other agreement the interest shall not be compounded, nor shall interest thereon be construed to bear interest. See 1 Tay. Stats., ch. 61. But this, we apprehend, does not prevent parties from making settlements of their mutual accounts which include compound interest. The case then stands on the footing of an executed contract.

It follows from these views that the balance found due the plaintiff at the last settlement, January 1, 1876, must be deemed to be correct; and in stating the account this rule has been adopted in this court: "When partial payments have been made, the payment is to apply in the first place to the discharge of the interest due. If the payment exceeds the interest, the surplus goes towards discharging the principal, and the subsequent interest is to be computed on the balance of principal remaining due. If the payment be less than the interest, the surplus of interest must not be taken to augment the principal, but interest continues on

the former principal until the period when the payments, taken together, exceed the interest due, and then the surplus is to be applied towards discharging the principal, and the interest is to be computed on the balance." *Hill v. Durand, post*, p. 160. Under this rule no compound interest should be allowed. It is true, the plaintiff claims that he was to have interest on all his indebtedness at the rate of ten per cent. computed annually. But we are not disposed to enforce the agreement for compound interest further than it has been acted upon by the parties in their settlements. But the question is, What rate is the plaintiff entitled to receive on the amount found due at the last settlement? So far as the notes are concerned, there can be no question, for they all expressly state that the interest shall be at the rate of ten per cent. Under the agreement for conducting the business the account current and the forty per cent. account were to bear interest at ten per cent. But it is said the statute provides, where there is a contract to pay interest at a rate exceeding seven per cent., it must "be clearly expressed in writing," to have effect given it. 1 Tay. Stats., ch. 61, § 1. The statute clearly refers to a loan or forbearance of money. Now, as to the advances made upon the contract, they stand upon a different footing from an ordinary loan, for the reasons given. There may be some doubt whether the forty per cent. account does not come within the statute; but we are inclined to think it does not. Besides, if the defendants ask to have the property and business as their own, why should they not pay the rate of interest which they agreed to pay as a condition to having them? In asking relief from a court of equity, should they not be required to do equity on their part? Interest at ten per cent. cannot be said to be excessive, or an unconscionable exaction.

We do not think the plaintiff should recover anything on his claim for personal and clerk's services, or for the use of

his credit, after January 1, 1876. It does not appear that he gave the business any special attention after that time. And while it may be true that his high commercial credit was invaluable to the concern, yet, under the circumstances, we are not disposed to allow him anything after the period indicated.

The judgment on the plaintiff's appeal is reversed, and the cause is remanded for a restatement of the account on the basis laid down in this opinion. That portion of the judgment appealed from by the defendants must necessarily be reversed, not because there is any error in it of which they can complain, but for the reason that the entire judgment is set aside on the other appeal. We do not feel called upon to consider at this time what relief the plaintiff will be entitled to in case the amount found due him on another accounting is not paid. The circuit court has ample power to grant such further relief as may be necessary for the protection and security of his rights.

We cannot take leave of the case without expressing our great obligation to the counsel on both sides for the very lucid and masterly manner they discussed the questions of law and fact which we have had to consider. Their arguments were of essential aid in the examination of the case.

*By the Court.*— The judgment on both appeals will be entered in accordance with this opinion.

LYON, J., took no part.